UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AMANDA HEBDEN,

    Plaintiff,

v.                                     Case No.: 8:18-cv-1063-T-33AAS

RONALD ANDERSON,

    Defendant.
_____/

**ORDER**

This matter comes before the Court pursuant to Plaintiff Amanda Hebden's Motion for Partial Summary Judgment (Doc. # 31), filed on February 15, 2019. Defendant Ronald Anderson responded on March 15, 2019, (Doc. # 32), and Hebden replied on March 29, 2019. (Doc. # 33). For the reasons that follow, the Motion is denied.

**I.    Background**

Anderson owns a six-unit rental property in Treasure Island, Florida. (Doc. # 1 at ¶¶ 8-9; Doc. # 27 at ¶¶ 8-9). In 2012, Hebden — a white woman — and her roommate Karen Wessel — another white woman — moved into one of Anderson's rental units. (Doc. # 1 at ¶ 11; Doc. # 27 at ¶ 11). Typically, "potential tenants are required to fill out an application for lease" and Anderson would "do a background check via the

1

internet." (Doc. # 1 at ¶ 10; Doc. # 27 at ¶ 10). Yet, while Hebden and Wessel filled out an application, Anderson told them no background check was done. (Doc. # 1 at ¶ 12; Doc. # 1-3 at 2; Doc. # 27 at ¶ 12). Hebden and Anderson made a verbal modification to the lease to allow Hebden to pay her rent on the third day of the month, rather than the first. (Doc. # 1 at ¶ 14; Doc. # 27 at ¶ 14). Anderson collected the rent personally and often collected it as late as the tenth day of the month. (Doc. # 1 at ¶ 15; Doc. # 27 at ¶ 15).

After the one-year lease agreement ended, Wessel moved out, but Hebden stayed in the unit under a month-to-month tenancy. (Doc. # 1 at ¶¶ 20-21; Doc. # 27 at ¶¶ 20-21). Then, Jeff Perro — a white man — moved into the unit as Hebden's new roommate in April 2014. (Doc. # 1 at ¶ 22; Doc. # 27 at ¶ 22). Perro was not required to fill out an application or undergo a background check. (Doc. # 1 at ¶ 23; Doc. # 27 at ¶ 23). Anderson maintained that "[t]he only reason [he] didn't obtain an application [from Perro] was due to [Anderson's] being a procrastinator" and that he "had intended to [ask Perro] but never did." (Doc. # 1-1 at 3).

When Hebden's upstairs neighbor got a new roommate — a white woman named Anika Evans — no application was required and no background check was run. (Doc. # 1 at ¶¶ 25-26; Doc.

# 27 at ¶ 25-26). Anderson maintained that an application and background check were not required for Evans because she "was never intended to be a resident, but rather a short time guest of [the upstairs neighbor]" and the upstairs neighbor "was solely responsible for the rent." (Doc. # 1-1 at 4).

During this time, the relationship between Hebden and Anderson deteriorated. (Doc. # 1 at ¶ 28; Doc. # 27 at ¶ 28). Hebden alleges the reason for this deterioration was a disagreement over the events that led to the deaths of Trayvon Martin and Michael Brown. (Doc. # 1 at ¶ 28; Doc. # 1-6 at 2). During the conversation, Anderson expressed his opinion that Michael Brown "got what he deserved," and used the "N-word" on at least three occasions in front of Hebden. (Doc. # 1-6 at 2; Doc. # 32-4 at 24:14-30:8; Doc. # 32-3 at 13:15-14:2).

Hebden asked that Anderson refrain from using the "N-word" in her presence. (Doc. # 1-6 at 2; Doc. # 1 at ¶ 32; Doc. # 27 at ¶ 32). She also asked that Anderson no longer return to her unit and, instead, she mailed her checks to Anderson beginning at the end of 2014 and would send Anderson text messages when necessary. (Doc. # 1 at ¶¶ 32-33; Doc. # 27 at ¶¶ 32-33).

Anderson acknowledged that he may have used the "N-word" in Hebden's presence, but denies that he is prejudiced against African Americans. (Doc. # 32-3 at 13:3-14:2). Anderson notes that he has had African-American tenants in the past and that he treated African-American relatives and guests of tenants with respect. (Doc. # 32-9; Doc. # 32-8).

In March 2015, Adam DeSimone — a new white tenant — moved into an apartment upstairs. (Doc. # 1 at ¶ 34; Doc. # 27 at ¶ 34). Anderson had DeSimone fill out a rental application, and DeSimone believes that Anderson conducted a background check. (Doc. # 1 at ¶ 35; Doc. # 27 at ¶ 35).

In April 2015, Anderson spoke to Rosemary Jones — another tenant of the property — about Hebden. (Doc. # 32-3 at 17:10-25; Doc. # 32-6 at 6:10-25, 8:1-5, 9:7-10; Doc. # 32-5). Anderson told Jones that he intended to terminate Hebden's tenancy because of issues he had with her. (Doc. # 32-3 at 17:16-23; Doc. # 32-6 at 6:14-23, 8:1-5; Doc. # 32-5). Specifically, Anderson told Jones that Hebden had been smoking in her apartment, which bothered the tenant in the apartment upstairs, James Lyngholm. (Doc. # 32-6 at 8:1-5; Doc. # 32-5). Indeed, Lyngholm had complained to Anderson that various smells — including cigarette smoke, to which Lyngholm was allergic — wafted up into his apartment from

4

Hebden's. (Doc. # 32-7 at 9:8-16, 10:21-11:19). Lyngholm threatened to move out of the property if the problem was not resolved. (Id. at 11:20-12:3; Doc. # 32-5). Anderson told Jones that "[Lyngholm] was an excellent tenant and that he would never loose [sic] a good tenant to keep a bad, disruptive one, he again saying that [Hebden] would have to go." (Doc. # 32-5). Lyngholm, who is white, filled out a rental application and underwent a background check when he moved in to his apartment. (Doc. # 32-7 at 3:18-21).

Eventually, Perro moved out of Hebden's apartment. Michael Peart — a Jamaican-American man — then moved in as Hebden's new roommate on June 4, 2015. (Doc. # 1 at ¶ 39; Doc. # 27 at ¶ 39). Peart moored his boat at the property's dock and began parking in the property's parking lot. (Doc. # 1 at ¶ 40; Doc. # 27 at ¶ 40).

In late July and early August 2015, Anderson left two letters sealed inside zip-lock baggies on Peart's car overnight for him to find the next morning. (Doc. # 1 at ¶¶ 43-48; Doc. # 27 at ¶¶ 43-48). The first letter — dated July 6, 2015, but not found by Peart until July 25, 2015 — requested that Peart fill out and return an enclosed rental application. (Doc. # 1-7 at 2). The letter also notified Peart that Anderson was "in the process of reassigning parking

places" and that Peart's parking space would "be the third parking slot from the left when facing the building." (Id.). Finally, the letter informed Peart that he did not have permission to moor his boat to the apartment complex's dock on a permanent basis and would have to reach an arrangement with Anderson to use the dock. (Id.).

Peart did not respond to the first letter and did not fill out the attached application. (Doc. # 1 at ¶¶ 47, 50; Doc. # 27 at ¶¶ 47, 50). Not having received a response to the first letter, Anderson left a second letter for Peart. (Doc. # 1 at ¶ 48; Doc. # 27 at ¶ 48; Doc. # 1-8). The second letter, dated August 1, 2015, reads in pertinent part:

> Enclosed is a copy of the letter I left on your car last Saturday, July 25, 2015. At that time you were provided with a stamped envelope addressed to me to return the requested information as well as my home phone and cell phone numbers.
>
> As you have failed to reply as of this date, I am giving you this second notice. Understand that your boat is illegally moored at my dock. You have never been given permission to moor your boat, and, unless you contact me and arrangements are made, your boat will be pulled and impounded. You will then be required to pay the towing and impound/storage fees to have your boat released. A lien against your boat is also possible.
>
> Kindly contact me as soon as possible but no later than Monday, August 3, 2015. My contact information is contained [in] the original letter left for you on Saturday, July 25, 2015.

(Doc. # 1-8).

6

Again, Peart did not respond to the letter and did not fill out an application. (Doc. # 1 at ¶¶ 47, 50; Doc. # 27 at ¶¶ 47, 50). Peart told Hebden that he would not fill out the application because Anderson was a former police officer and Peart feared Anderson would use his personal information "for some sort of vendetta or agenda." (Doc. # 1 at ¶ 50; Doc. # 1-9). But Peart did eventually remove his boat from the dock on August 17, 2015 — over two weeks after the second letter was left for him. (Doc. # 1 at ¶ 54; Doc. # 27 at ¶ 54).

Then, on August 18, 2015, Hebden and Peart received a notice of non-renewal from Anderson, providing that both were to vacate the property by September 30, 2015. (Doc. # 1 at ¶ 55; Doc. # 1-10; Doc. # 27 at ¶ 55). Peart voluntarily vacated the apartment on September 3, 2015. (Doc. # 1 at ¶ 56; Doc. # 27 at ¶ 56). But, on September 21, 2015, "Hebden filed a housing discrimination complaint with the Pinellas County Office of Human Rights ('PCOHR') alleging violations of 42 U.S.C. § 3604(a) and (b)." (Doc. # 1 at ¶ 58; Doc. # 1-12).

After that, Anderson initiated eviction proceedings against Hebden on October 9, 2015. (Doc. # 1 at ¶ 59; Doc. # 27 at ¶ 59; Doc. # 1-13). Meanwhile, the PCOHR's investigation continued. Hebden notes that all residents of the rental

7

property were white during the PCOHR's investigation. (Doc. # 1 at ¶ 62; Doc. # 27 at ¶ 62).

Hebden then initiated this action on May 1, 2018, asserting claims for race discrimination and retaliation under the Fair Housing Act (FHA), 42 U.S.C. §§ 3604 and 3617, Florida's Fair Housing Act, Fla. Stat. §§ 760.23 and 760.37, and the Pinellas County Code, §§ 70-176 and 70-183. (Doc. # 1). Anderson moved to dismiss on July 20, 2018 (Doc. # 19), and the Court denied that motion on August 20, 2018. (Doc. # 26). Anderson filed his Answer to the Complaint on August 31, 2018. (Doc. # 27). The case proceeded through discovery. The parties mediated on October 29, 2018, but reached an impasse. (Doc. # 28).

On February 15, 2019, Hebden moved for partial summary judgment as to liability for all claims. (Doc. # 31). Anderson has responded, (Doc. # 32), and Hebden has replied. (Doc. # 33). The Motion is ripe for review.

## II. <u>Legal Standard</u>

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the

8

existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996)(citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

"When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995)(quoting Celotex, 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

**III. Analysis**

Hebden insists that summary judgment as to Anderson's liability is appropriate because no genuine issues of material fact exist regarding the alleged violations of the FHA and the Florida Statutes and Pinellas County Code sections that mirror the FHA. (Doc. # 31 at 1-4). Because the state statutes and county codes at issue mirror the FHA, Hebden argues that "the same legal arguments apply to all counts of the Complaint." (Id. at 12); see Loren v. Sasser, 309 F.3d

10

1296, 1299 n. 9 (11th Cir. 2002)("The Florida Fair Housing Act contains statutory provisions that are substantively identical to the federal Fair Housing Act.").

The Court will address each alleged violation of the FHA — and the mirror Florida Statutes and Pinellas County Code fair housing sections — separately.

### A. Discrimination in Violation of 42 U.S.C. § 3604, Fla. Stat. § 760.23, and Pinellas County Code, § 70.176

In Counts I, III, and V, Hebden claims that Anderson committed housing discrimination by serving her with the notice of non-renewal and requiring Peart to submit a rental application and undergo a background check. (Doc. # 1 at 8-11). According to Hebden, "Anderson's Notice of Non-Renewal to Hebden violates [Section] 3604(a)'s prohibition against 'making housing unavailable' on the basis of a protected characteristic such as race and [Section] 3604(b)'s prohibition against imposing different terms and conditions because of race." (Doc. # 31 at 9). Hebden also insists that Anderson's request that Peart submit a rental application "and undergo a background check when previous Caucasian roommates of Hebden were not required to do so violates [Section] 3604(b), because [Anderson] discriminates against Hebden, via her roommate, because of Peart's race, in the

11

terms, conditions, or privileges of rental of a dwelling, violating [Section] 3604(b)." (Id. at 11).

Section 3604(a) makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). And Section 3604(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." Id. § 3604(b). Section 3604(b) applies to discriminatory evictions and attempted evictions. See Harris v. Itzhaki, 183 F.3d 1043, 1052 (9th Cir. 1999)("Ms. Harris has established a prima facie disparate treatment claim under the FHA — that Harris, as a protected class member under the FHA, was subject to eviction proceedings that were contrary to the established policy and practice.").

Here, genuine issues of material fact exist regarding the reason for Anderson's termination of Hebden's residence at the property and for his request that Peart submit a rental

12

application and undergo a background check. There is evidence that white tenants — including Hebden herself — were often required to submit rental applications or undergo background checks to live at the property. (Doc. # 1 at ¶¶ 10, 12, 34, 35; Doc. # 27 at ¶¶ 10, 12, 34, 35; Doc. # 32-7 at 3:18-21). And Anderson maintains that he did not require Evans — the white woman who moved in with Hebden's upstairs neighbor — to fill out an application because she was merely a tenant's guest and not responsible for rent. (Doc. # 1-1 at 4).

Anderson has also presented evidence that he was at least considering — if he had not already decided on — terminating Hebden's residence at the property before Peart became her roommate. (Doc. # 32-3 at 17:10-25; Doc. # 32-6 at 6:10-25, 8:1-5, 9:7-10; Doc. # 32-5). Furthermore, a reasonable jury could conclude that Peart's failure to fill out the rental application or timely remove his boat from the property's dock — rather than Peart's race — motivated Anderson to terminate Hebden and Peart's tenancy. (Doc. # 1 at ¶¶ 47, 50; Doc. # 27 at ¶¶ 47, 50). Thus, a reasonable jury could conclude that Anderson did not violate the FHA and the mirror state and county fair housing laws. Therefore, summary judgment is inappropriate for these claims.

### B. Interference, Coercion, or Intimidation in Violation of 42 U.S.C. § 3617, Fla. Stat. § 760.37, and Pinellas County Code, § 70.183

In Counts II, IV, and VI, Hebden claims that Anderson's notice of non-renewal and eviction of Hebden violate Section 3617 of the FHA and its related state and county fair housing laws. (Doc. # 1 at 9-12).

Section 3617 makes it unlawful

> to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617.

"To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." Philippeaux v. Apartment Inv. & Mgmt. Co., 598 F. App'x 640, 644 (11th Cir. 2015)(citation omitted). "A plaintiff engages in statutorily protected activity when he or she protests . . . conduct which is actually lawful, so long as he or she demonstrates a good faith, reasonable belief that the [conduct engaged in] was . . . unlawful." Id. at 644-45 (citation omitted).

14

Additionally, to prove a claim under Section 3617, "a plaintiff must establish intentional discrimination." Bone v. Vill. Club, Inc., 223 F. Supp. 3d 1203, 1217 (M.D. Fla. 2016); Sofarelli v. Pinellas County, 931 F.2d 718, 722 (11th Cir. 1991)(explaining that, to win a Section 3617 claim, the plaintiff must show that discriminatory animus "played some role").

Hebden argues that Anderson violated Section 3617 when he delivered the notice of non-renewal because Hebden had told Peart not to fill out the application for residency based on her understanding that previous white roommates of various tenants had not been required to do so. (Doc. # 31 at 12). Additionally, she argues Anderson violated Section 3617 "by retaliating against Hebden even further by filing an action for eviction against her, after she had filed a fair housing discrimination complaint with PCOHR." (Id.).

Again, genuine issues of material fact exist that preclude an award of summary judgment. A reasonable jury could conclude that Anderson terminated Hebden's tenancy and subsequently evicted her because of conflicts Anderson had with Hebden before Peart moved in and because of Peart's failure to complete the rental application or promptly move his boat. (Doc. # 1 at ¶¶ 47, 50; Doc. # 27 at ¶¶ 47, 50;

Doc. # 32-5). In short, a reasonable factfinder could conclude that Anderson's actions were not motivated by discriminatory animus and were not made in retaliation for Hebden's alleged protected activity. Therefore, summary judgment is inappropriate.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

Plaintiff Amanda Hebden's Motion for Partial Summary Judgment (Doc. # 31) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 2nd day of April, 2019.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE